# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

In Re:

Jesus J. Marroquin

    Debtor(s)

Barnard L. Bartson

    Plaintiff(s)

        v.

Jesus J. Marroquin

    Defendant(s)

**JUDGE RICHARD L. SPEER**

Case No. 09-3011

(Related Case: 08-35266)

## DECISION AND ORDER

This cause comes before the Court after a Trial on the Plaintiff's Complaint to Determine Dischargeability against the Defendant, Jesus Marroquin. At the Trial, the Court also heard the Plaintiff's complaint to determine dischargeability in a related adversary proceeding: Bernard L. Bartson v. Paul R. Garza, Jr., Case No. 09-3012. Both these matters will be addressed together herein, as both actions arose from substantially the same transactions and occurrences. As well, in each action, the same Plaintiff, Bernard L. Bartson, seeks to have its claims against the respective Defendants held to be nondischargeable debts pursuant to the same statutory exception to dischargeability – that as set forth in 11 U.S.C. § 523(a)(2)(A) which generally excepts from discharge any debt incurred by fraud.

At the Trial held on these matters, all the Parties were afforded the opportunity to present evidence and make any arguments that they wished the Court to consider in reaching its decision. At the conclusion of the Trial, this Court deferred ruling on the matter so as to afford the opportunity to thoroughly review the evidence presented, the arguments of the Parties, as well as the entire record in this case. The Court has now had this opportunity and, for the reasons set forth herein, finds that in neither this proceeding, nor the related adversary proceeding, has the Plaintiff sustained his evidentiary burden. Accordingly, the Complaints brought by the Plaintiff will be Dismissed. With respect to this ruling, the succeeding discussion shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FACTS

The Defendants, Paul Garza and Jesus Marroquin, are related by marriage. In the year 2000, the Defendants began operating together a business entity known as R&E Exports, Inc. The initial capital to start the business was obtained through an inheritance; later, the Defendants gained access to additional capital for the business by obtaining extensions of credit from a financial institution. At all times, the Defendants were the sole owners of R&E Exports and its only officers. The matters before the Court stem directly from the Defendants' operation of this business entity.

As a matter of background, the Plaintiff is a married man, 77 years of age. The Plaintiff currently has a number of issues with his health. During his lifetime, the Plaintiff has often engaged in business transactions similar to those conducted by the Defendants in their operation of R&E Exports. As an investment, the Plaintiff has also often purchased and sold real property.

The Defendants' business, R&E Exports, is an Ohio corporation and centered its business operations on purchasing trucks, truck parts, and other like equipment and then reselling its purchases to third parties. The Defendants bought such items from numerous places located

Page 2

throughout the United States. Its sales, on the other hand, were made primarily to third parties located in Latin American countries.

The Defendants' respective roles in R&E Exports varied. Based upon his years of experience, through which he became proficient at identifying items which could be resold at a profit, Mr. Garza, the elder of the two Defendants, was primarily responsible for inventory purchases. On the other hand, the Defendant, Mr. Marroquin, operated the day-to-day affairs of the company.

For some time, the operation of the business was profitable, and employed a number of people. The Defendants, however, stated that due to changing economic conditions, especially rising fuel prices, R&E Exports eventually became unprofitable and its operations terminated. During the viability of the business, the evidence showed that R&E Exports consistently paid each of the Defendants an annual salary of approximately $80,000.00.

In operating R&E Exports, the Defendants maintained two bank accounts: one for employee payroll; the second account was then used for all other business matters. For the latter account, it was the Defendants' practice to deposit into their general account all funds received through business sales. On the expense side of the ledger, the Defendants then used their general account to pay for expenses incurred in the day-to-day operations of R&E Exports, including paying for equipment purchases, costs associated with the operation of their business office, travel expenses as well as entertainment expenses incurred for both clients and employees. It was also the Defendants' business practice to keep a relatively low balance in their general business account, with the Defendants utilizing a line of credit to make deposits into their general account when needed, and then paying down the line of credit when additional funds became available.

The relationship between the Parties began in 2004 when the Plaintiff sought to sell a snow plow he no longer needed. Through their initial contacts, the Plaintiff and the Defendants,

Page 3

particularly, Mr. Garza, found that they both shared a common interest – that of buying and selling trucks and other machinery. In short time, the Plaintiff and Mr. Garza became friends. In 2004, the Defendants discussed with the Plaintiff the possibility of doing business together. The Plaintiff, thereafter, agreed to invest with the Defendants.

Before investing with the Defendants, however, the Plaintiff, although receiving at some point an informal recommendation from the Defendants' financial institution, did not do any background check or other objective investigation of the Defendants' financial condition. Instead, the Plaintiff based his decision to invest on his perception that the Defendants' business operation was well run and managed.

From May 6, 2004 through December 27, 2005, the Plaintiff and the Defendants executed no less than 12 contractual agreements for the purchase and resale of trucks, truck parts, and related equipment. The face value of these agreements totaled $2,125,720.00 and, whether by a direct infusion of capital or rolling over funds from previous contracts, the Plaintiff extended credit to the Defendants for all but a minor portion of the face value of the contracts.[1] (Doc. No. 104). When excluding those funds rolled over, the Plaintiff's actual investment (*e.g.*, out-of-pocket investment) with the Defendants totaled $1,203,970.00. (Doc. No. 109, Ex. 25).

Many of the contracts between the Parties were executed, and credit extended by the Plaintiff in short succession. For example, between May 6, 2004 and June 3, 2004, four separate contracts were executed, involving an extension of credit exceeding three quarters of a million dollars. During this interval of time, the Plaintiff did not receive any return on his investment.

---

[1]
The Plaintiff did not dispute the Defendants contention that under one contract, dated January 11, 2005, and for the value of $60,000.00, that only $30,000.00 in credit was actually extended. (Doc. No. 110).

Page 4

The Plaintiff's role in the Defendants' business, although not rising to the level of a partnership, was more than that of a passive investor. To give a few examples: the Plaintiff and the Defendants attended auctions together, and in addition, on one occasion, the Plaintiff and Mr. Garza traveled together to Atlanta to investigate a possible business opportunity. The Plaintiff also initiated some of the contracts entered into by the Parties and was present when some items under the contracts were being purchased.

The terms of the Parties' agreements generally provided that, based upon his extension of credit, the Plaintiff would receive the return of his capital investment plus a share of any profits realized from the resale of the items purchased. The Parties' agreements also provided generally that each transaction be kept separate. With the exception of the first agreement, however, no time limit on repayment was set forth in the Parties' contracts. Instead, payments to the Plaintiff would only become due if and when the items purchased were resold. As a result, since it often took time to sell many items, and since many of the Parties' contracts were executed in short succession, it was often the case that the Plaintiff extended credit to the Defendants without having received any payment on the prior contracts. Normally, in these instances, the Parties agreed to "rollover" the Plaintiff's investment, and any yet to be realized profits, into subsequent contracts.

Upon receiving the extensions of credit from the Plaintiff, the Defendants did not segregate the Plaintiff's investment; instead, they simply deposited any funds received from the Plaintiff into their general business account. The Defendants, however, did segregate at their business location some of the items they purchased with the funds invested by the Plaintiff. The Plaintiff was also offered reasonable access to the Defendants' business facility, and had occasion to view some of his purchases at the Defendants' business location.

The dealings between the Parties were also not limited to the purchase and sale of trucks and truck parts. In one instance, the Plaintiff extended credit to the Defendants to purchase a liquor

Page 5

license in anticipation of opening a restaurant, an endeavor which never came to fruition. In addition, the Plaintiff extended credit to the Defendants, totaling $98,000.00, to purchase real property consisting of two residences. These properties were eventually purchased in August of 2005, and titled in the name of the Plaintiff and the Defendants' business. The intent of the Parties was to expeditiously sell the properties. However, this has yet to occur. It was further disclosed that, after purchasing the properties, relative(s) of the Defendants rented at least one of the properties, but no rent was ever remitted to the Plaintiff, with the rent instead going into the Defendants' general business account.

Over a period of time, the business activity of R&E Exports began to decline. Coinciding roughly with the initial decline of the Defendants' business, the Plaintiff also ceased making any capital contributions to the Defendants. Shortly thereafter, to keep their business viable, the Defendants sought alternative financing. During 2007 and 2008, according to the Defendant, Mr. Marroquin, the business of R&E Exports declined even further, with the Defendants eventually ceasing their operation of R&E Exports. In January of 2008, the Plaintiff, having lost a substantial portion of his investment, brought suit against the Defendants in state court for fraud.

On October 6, 2008, both of the Defendants filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. At the time they filed for relief, both of the Defendants represented that they had unsecured liabilities, consisting primarily of business debts, exceeding $1,500,000.00. Of their unsecured liabilities, the great majority arose from two claims: (1) a commercial loan to Huntington Bank for just over $720,000.00; and (2) the Plaintiff's claim which the Defendants listed as a non-contingent, undisputed claim in the approximate amount of $613,000.00.

According to further financial figures provided by the Defendants, at the time they sought bankruptcy relief they had paid to the Plaintiff a total of $591,711.67. (Doc. 109, Ex. N). The

Page 6

Plaintiff did not seriously dispute this figure, but asserts that, contrary to the disclosure made by the Defendants, his actual damages total $987,606.03. (Doc. No. 110). The Plaintiff now contends that these damages are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## LAW

Before this Court is the Plaintiff's Complaint to Determine Dischargeability of Debt. Proceedings brought to determine the dischargeability of particular debts are deemed to be core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, this Court has the jurisdictional authority to enter final orders and judgments in this matter. 28 U.S.C. § 157(b)(1).

The Plaintiff's Complaint to determine dischargeability is brought pursuant to § 523(a)(2)(A) of the Bankruptcy Code. This provision provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

The purpose of this provision is to except from discharge any debt which arises from a debtor's dishonest conduct, thereby implementing a fundamental bankruptcy policy that only those debts which are honestly incurred may be discharged. *EDM Machine Sales, Inc. v. Kay Harrison (In re Harrison)*, 301 B.R. 849, 853 (Bankr. N.D.Ohio 2003).

Page 7

Yet, to also ensure that the Congressional policy in favor of providing a debtor with a fresh-start is furthered, exceptions to dischargeability, including one brought under 523(a)(2)(A), are narrowly construed. *Ewing v. Bissonnette (In re Bissonnette)*, 398 B.R. 189, 193 (Bankr. N.D.Ohio.2008). Consistent with this, the party seeking to have a debt held nondischargeable bears the overall burden of persuasion to establish the applicability of the asserted statutory exception to discharge. *Brandenberger v. Chinnery (In re Chinnery)*, 196 B.R. 836, 837 (Bankr.W.D.Mo.1996). For this purpose, a preponderance of the evidence standard is applied. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In order to sustain a cause of action under § 523(a)(2)(A), the moving party must establish the existence of the five common law elements of fraud. *Chase Manhattan Bank v. Alnajjar, (In re Alnajjar)*, 276 B.R. 844, 848 (Bankr. N.D.Ohio 2002). These elements are: (1) the debtor made a false representation; (2) the debtor knew such representation to be false at the time they were made; (3) the representation was made with intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor's loss was the proximate result of the misrepresentation having been made. *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D.Ohio 2001). If one or more of these elements are not established, a plaintiff's claim for nondischargeability will fail.

At its core, common-law fraud, and by extension fraud under § 523(a)(2)(A), entails a conscious wrongdoing. *United States v. Wunderlich*, 342 U.S. 98, 100, 72 S.Ct. 154, 155, 96 L.Ed. 113 (1951); *Durns v. Dawson (In re Dawson)*, 264 B.R. 13, 16 (Bankr.N.D.Iowa 2001). For purposes of § 523(a)(2)(A), this characteristic is embodied by the second and third elements, *supra*, which together ask whether a debtor, having present knowledge as to the falsity of his or her representation(s), acted with the intent to deceive the plaintiff?

Page 8

For purposes of § 523(a)(2)(A), the mere breach of a promise to pay does not establish the existence of an intent to defraud. Otherwise, any breach of contract would be a nondischargeable debt. *Giansante & Cobb, LLC v. Singh (In re Singh)*, 433 B.R. 139, 163 (Bankr. E.D.Pa. 2010). Instead, an intent to defraud will not exist unless the maker of the promise knew his statement to be false at the time the statement was made. *Clauss v. Church (In re Church)*, 328 B.R. 544, 547 (8th Cir. B.A.P.2005).

The determination of a debtor's intent is made using a subjective standard, requiring the court to consider the debtor, individually, as opposed to an objective, reasonable person standard. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998). *See also Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir.1997) ("A dumb but honest defendant does not satisfy the test of scienter."). Whether a debtor subjectively intended to perform as promised is a factually intensive inquiry and, since a debtor will rarely admit to acting in a fraudulent manner, circumstantial evidence will often be needed to determine if the debtor acted with the requisite intent. *Weeber v. Boyd (In Re Boyd)*, 322 B.R. 318, 324 (Bankr. N.D.Ohio 2004).

Circumstantial evidence will often come in the form of indicia traditionally considered when assessing fraud, often referred to as badges of fraud. For purposes of § 523(a)(2)(A), a common badge of fraud concerns whether a defendant made any effort to perform their obligation. *Chase Bank v. Brumbaugh (In re Brumbaugh)*, 383 B.R. 907, 912 (Bankr.N.D.Ohio 2007). As this Court previously explained: "as a general rule, the greater the extent of a debtor's performance, the less likely it will be that they possessed an intent to defraud." *Ewing v. Bissonnette (In re Bissonnette)*, 398 B.R. 189, 194 (Bankr. N.D.Ohio.2008).

Other badges of fraud include: (1) the suspicious timing and chronology of events; (2) a debtor's lack of financial health at the time of the transaction (*e.g.*, insolvency); (3) the failure to keep adequate records; and (4) the existence of unusual transfers. *EDM Machine Sales, Inc. v. Kay*

Page 9

*Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D.Ohio 2003). In utilizing such indicia, however, the Sixth Circuit has cautioned against "factor-counting," instead holding, "[w]hat courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 282 (6th Cir.1998).

## ANALYSIS

Although they are interrelated, there exists between the Parties two overall types of transactions: (1) the 12 contracts involving the buying and selling of trucks, truck parts and related items with R&E Exports; and (2) transactions concerning the real estate the Parties purchased together. Because these transactions are different in nature, they will first be addressed separately, beginning with the transactions directly involving R&E Exports. Afterwards, the Court will address a position put forth by the Plaintiff concerning the overall nature of the Defendants' actions: That, through investing with the Defendants, the Plaintiff was the victim of a Ponzi scheme.

### Transactions concerning the Defendants' business, R&E Exports

For the contracts entered into by the Parties, the Plaintiff raised a number of considerations which he maintains are indicative of the Defendants' fraudulent intent. Such indicia of fraud as raised by the Plaintiff may be summarized in these terms: (1) the Defendants were experiencing financial difficulties when they sought out the Plaintiff as an investor; (2) given his age and health problems, the Defendants placed undue influence upon him to make further investments; (3) the Defendants did not timely perform their contractual obligations; and (4) the Defendants failed to properly account for the Plaintiff's investment. Regarding the last indicia, the Plaintiff called particular attention to the fact that the Defendants failed to segregate and properly track the funds

invested by him, instead, placing the invested funds in their general account and then using some of the funds for the day-to-day operation of R&E Exports.

The points raised by the Plaintiff are entirely valid. Human nature being what it is, a person is more likely to commit fraud when they are placed in a stressful situation, with financial difficulties being an obvious stressor. *See United States v. Metallo*, 908 F.2d 795, 798 (11th Cir.1990), *cert. denied*, 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992) ("evidence of financial difficulties is admissible in fraud prosecutions to demonstrate knowledge, motive, intent, design, and absence of mistake.").

It also holds true that persons of age and/or with health issues may be more susceptible to manipulation. *See U.S. v. Bean*, 85 F.3d 629 (Table) (6th Cir. 1996) (elderly persons with identifiable disabilities may "render[] them unusually susceptible to manipulation and deception."). Finally, not promptly performing one's obligations and using funds, as the Defendants did, for a purpose other than what was intended, does not place the Defendants' actions in a friendly light. *See Herbstein v. Bruetman (In re Bruetman)*, 259 B.R. 649, 666 (Bankr. N.D.Ill.2001) (diverting an investor's capital contribution from its intended purpose to benefit another business of a debtor supported a finding of nondischargeability under § 523(a)(2)(A)). In this way, the Defendants, by commingling the Plaintiff's investment with their general business funds, clearly acted contrary to Plaintiff's expectations and the intent of the Parties' agreements.

At the same time, the evidence given at the Trial tended to minimize or nullify many of the concerns raised by the Plaintiff. First, contrary to the Plaintiff's portrayal of events, the business relationship between the Parties does not appear to have been founded upon the Defendants' need to obtain funds for the survival of R&E Exports. Instead, the evidence shows that, leading up to the time their business relationship commenced, in May of 2004, neither the Defendants nor R&E Exports was experiencing financial difficulties.

Page 11

In this regard, tax returns from R&E Exports show that, from 2002 through 2004, the company, even after paying all salaries, including those of the Defendants, was profitable. (Doc. No. 109, Ex. F,G,H). Of particular significance, the 2004 federal-tax return of R&E Exports shows that, on gross receipts of more than two million dollars, it earned a profit of $136,737.00. (Doc. No. 109, Ex. H). Alone, therefore, the financial condition of the Defendants cannot be said to have provided them with an impetus to seek the Plaintiff out as an investor for the purpose of defrauding him.

Secondly, the Court is not of the persuasion that the Defendants could have used the Plaintiff's age and health problems to unfairly take advantage of him. At the Trial, the Court found the Plaintiff to be a strong-willed individual, not easily susceptible to manipulation. This is consistent with the Plaintiff's background which shows that, over the course of his life, he has been an astute businessman, having made many successful investments over the course of his career. There is also a question as to whether the Defendants were fully responsible for initiating the business dealings between the Parties, with the evidence tending to show that the Plaintiff was likewise eager to enter into a business relationship with the Defendants. Therefore, contrary to the picture painted by the Plaintiff, the circumstances before the Court are not indicative of the Plaintiff being an innocent bystander whom the Defendants targeted for his money.

As a third indicator of the Defendants' fraud, the Plaintiff pointed to the slowness of the time in which it took to complete many of the transactions he made with the Defendants. The evidence in this regard is not disputed: the Plaintiff made multiple capital contributions, and rolled over many of his contracts, before realizing any return on his investments. In this way, it is the Plaintiff's position that the Defendants attempted to string him along, promising future returns on his investment, all the while requiring the Plaintiff to increase his capital contributions. This assertion, however, lacks a solid foundation.

Page 12

First, there is no evidence that the Defendants held the Plaintiff's prior capital contributions hostage to future infusions of capital. Restated, the Court has no evidence that the Defendants told the Plaintiff that he would only realize a return on his past investments if he made further capital contributions to R&E Exports. Second, when looking at the operational side of their business, nothing strikes this Court as unusual about the Defendants experiencing some delays in selling their trucks and other like machinery. Market saturation and changes in demand for such goods would be expected. Third, the Plaintiff, having experience in the field, could not have been ignorant of such risks. In fact, the reality that delays may occur in selling items is made a very part of the Parties' agreements, with all of their contracts, with the exception of the first, being silent as to the time frame for completion.

The final indicia of fraud raised by the Plaintiff looks to the Defendants' failure to properly account for and segregate his investments as required under the terms of the Parties' contracts. To this end, the Parties' agreements provided that each of the Parties' transactions was to be kept separate. In response, the Defendants, while acknowledging a breach of their contractual duty when they commingled the funds invested by the Plaintiff, pled that nothing nefarious was meant by such an arrangement, and that this was simply their standard business practice.

As stated *supra*, a mere breach of contract does not give rise to an intent to defraud. Instead, fraud requires a showing that the maker of the promise knew his statement to be false at the time the statement was made. For this purpose, the evidence does not support a finding that the Defendants, at the time their contracts with the Plaintiff were executed, never intended to comply with their contractual obligations, – this being to repay the Plaintiff his capital contributions plus a share of any profits realized. This conclusion first rests on the Defendants' financial condition at the time they executed their contracts with the Plaintiff.

Page 13

The evidence in this case indicates that, at the time they executed their contracts with the Plaintiff, the Defendants had sufficient financial resources available to repay the Plaintiff. Such resources, while not kept in a separate account as the Plaintiff expected, came from a combination of four sources: (1) the general bank account of R&E Exports; (2) accounts receivable; (3) inventory; and (4) a line of credit. All things being equal, it can be assumed that a debtor, with the ability to repay their obligations, is less likely to commit fraud as compared to a debtor who lacks the means to repay their obligations. Thus, the Defendants' solvency, while not necessarily a dispositive consideration, weighs against a finding a fraud.

A lack of fraudulent intent is further supported by evidence presented at the Trial which revealed that the Defendants, during the course of their business relationship with the Plaintiff, performed an appreciable amount of their contractual obligations. Of note, the Defendants repaid to the Plaintiff the sum of $591,711.67 out of a total of $1,203,970.00 in credit extended. The Defendants also held as inventory an appreciable amount of the Plaintiff's property, thereby further diminishing this spread. The Defendants also purchased, when possible, most of the items set forth in the Parties' contracts. Overall, this degree of performance is hardly indicative of a scheme to defraud.

Other considerations also bend against a finding that an intent to defraud is indicated by the Defendants' failure to segregate the Plaintiff's investments. One, as a practicable matter, and while not condoning the practice, it is not atypical for the principals of closely-held corporations to commingle their funds. The Defendants' failure to segregate the Plaintiff's investment is also somewhat of a misnomer, with the Defendants often segregating the items purchased with the Plaintiff's investment (but not the funds) at their place of business.

In a similar way, the Plaintiff does not dispute that he was afforded reasonable access to the Defendants' business facility, and that had occasion to view some of his purchases at the Defendants'

Page 14

business location. It is also assumed to be true that, pursuant to representations made by the Defendants, the Plaintiff was afforded the opportunity to personally take possession of those items of property belonging to him and located on the premises of R&E Exports, but that he declined the offer.

In this light, the explanation offered by the Defendant, Mr. Marroquin, concerning the Defendants' failure to specifically segregate the Plaintiff's investment becomes viable. This explanation holds that the Defendants believed that, by agreeing to segregate the Plaintiff's investment, they were simply required to account for the Plaintiff's investment at the time of sale, and that they were not specifically required to place the Plaintiff's investment in a separately designated account.

For all these reasons, therefore, the evidence does not support the Plaintiff's position that the Defendants' breach of their contractual duties rises to the level of fraudulent intent for purposes of 11 U.S.C. § 523(a)(2)(A)

### Real Estate Transactions

In addition to the agreements directly involving the Defendants' business, R&E Exports, the Parties also entered into a deal to purchase together real property. The terms of this agreement essentially involved three steps: (1) the Plaintiff would purchase two properties with his own assets; (2) the Debtors would then be responsible for finding a buyer for the properties; and (3) after the sale had been completed, any profits realized from the sale would be split among the Parties. At the present time, however, only step one has been completed, with the two properties being purchased by the Plaintiff in 2005.

Page 15

As evidence of the Defendants' fraud with regards to the transactions involving the two parcels of real property, the Plaintiff relied first on the fact that the Defendants titled the properties in not just his name, but also in the name of the Defendants' business. The Plaintiff then called attention to the Defendants' subsequent actions whereby they allowed relative(s) to live in the properties and collected rent from the properties, but failed to forward any portion of the rent proceeds to the Plaintiff. (Doc. No. 104).

As with the transactions involving R&E Exports, the Court does find the points raised by the Plaintiff to be a concern. At its core, it does not seem ordinary that a person would agree to finance the entire purchase price of a residence, and be named on the property's title, but then not assert a right to a portion of the proceeds generated from the property. At the same time, the evidence in this particular case would tend to support that, notwithstanding its unusual character, such an arrangement actually came to be the understanding between the Parties. That is, the understanding between the Parties, whether explicit or implicit, was that until the sale of the property was effectuated, the Defendants would manage and run the properties.

The reasoning behind this conclusion begins with consideration of what is lacking in this case: No firm evidence was offered contradicting the Defendants' position that they have been unable to find a viable buyer for the properties, despite having made a good faith effort to sell the properties. Thus, in such a situation, it would make sense to rent the properties, even to relatives, so as to ensure the availability of funds to provide for the proper upkeep and maintenance of the properties – *e.g.*, payment of taxes, repairs and insurance.

But what the Court finds particularly compelling is the length of time between two salient events. The properties were purchased in August of 2005; however, the Plaintiff did not formerly raise any issue with the Defendants' management of the properties until January of 2008, when he brought suit against Defendants. In this context, given his business acumen and experience with real

estate, it would seem rather odd that the Plaintiff had not given his approval, at least tacitly, for the Defendants to continue operating and managing the properties in the manner described.

Yet, what ultimately tips the scales against any finding of fraud regarding the properties is this: From a transactional standpoint, the Parties' agreement is still incomplete. Put differently, no intent to defraud can be deduced since there is no indication that the Defendants have sought to undermine the sale of the properties and the agreement between the Parties regarding the sale of the properties is still fully capable of being performed. Moreover, as set forth later, the Defendants will be afforded the opportunity to complete their end of the bargain.

### Ponzi Scheme

In support of a finding of fraud under § 523(a)(2)(A), the Plaintiff also put forth the theory that his investments with the Defendants constituted a Ponzi scheme.[2] A Ponzi scheme is any sort of fraudulent arrangement that uses later acquired funds or products to pay preexisting investments. *McLemore v. Third National Bank in Nashville (In re Montgomery)*, 123 B.R. 801, 814 (Bankr. M.D.Tenn.1991), *aff'd*, 136 B.R. 727 (M.D. Tenn. 1992), *aff'd*, 983 F.2d 1389 (6th Cir. 1993). In a Ponzi scheme, returns to investors are not dependent on the profitability of the underlying business venture; rather returns are dependent on the continual infusion of capital contributions. A Ponzi scheme is, therefore, by definition fraudulent, and hence a debt incurred therefrom is, *per se*,

---

2

The term Ponzi Scheme is derived from the individual Edward Ponzi. During the 1920's, Mr. Ponzi defraud thousands of investors out of millions of dollars by offering to pay them a very high return on their investment. In order to perpetrate his fraud, Mr. Ponzi used funds from later investors to pay back earlier investors, all the while taking large amounts of money to fund a lavish lifestyle. *See Cunningham v. Brown*, 265 U.S. 1, 7-9, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (detailing the criminal career of Charles Ponzi).

Page 17

nondischargeable for purposes of § 523(a)(2)(A). *In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656 (Bankr. M.D.Fla.2002) ("A Ponzi scheme is by definition fraudulent.").

Ponzi schemes, although they come in many different forms, usually have a number of characteristics in common:[3] To determine whether a Ponzi scheme exists, courts generally assess whether such common characteristics are present and, if present, the strength of the characteristic to the applicable situation. These common characteristics are as follows:

First, the fraud of the Ponzi scheme will usually entail using funds contributed by previous investors to pay subsequent investors. *In re M & L Business Mach. Co.*, 84 F.3d 1330, 1335 (10th Cir. 1996), *cert. denied*, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). Second, in the typical Ponzi scheme, investors are promised high rates of return, usually over a short period of time. *Donell v. Kowell*, 533 F.3d 762, 767 fn.2 (9th Cir. 2008). Third, the promoter of the Ponzi scheme will generally pay back the early investments on a timely and expedited basis so as to generate enthusiasm for additional contributions.

Fourth, the Ponzi business commonly has little or no legitimate business purpose. *In re Vaughan*, 429 B.R. 14, 27 (Bankr. D.N.M. 2010). As such, Ponzi schemes are subject to ultimate collapse when the promoter of the scheme is unable to attract more funds to pay for demands made on previous contributions. *See In re Rose*, 425 B.R. 145, 153 (Bankr. M.D.Pa. 2010). Finally, the promoter of the Ponzi scheme typically lives a lavish lifestyle.

Addressing these characteristics in order, the Court is not persuaded that the Plaintiff was the victim of a Ponzi scheme. Lacking from the onset is the existence of multiple investors. With the

---

[3]

For a thorough discussion see PONZI SCHEMES–PICKING UP THE PIECES FROM A FALLEN HOUSE OF CARDS, Jeff Sonn, 1755 PLI/Corp 443 (2009).

exception of the Defendants, as the principals of the business, the only investor in R&E Exports was the Plaintiff. This is not to say, as an expert offered by the Plaintiff pointed out, that a Ponzi scheme must be composed of more than one investor. However, the lack of multiple investors does detract from the Plaintiff's position that his investment with the Defendants constituted a Ponzi scheme.

Also detracting from the existence of a Ponzi scheme, the Defendants did not promise the Plaintiff a high rate of return on his investment. Instead, the contractual arrangement between the Parties simply provided that, upon the sale of the inventory purchased with his investments, the Plaintiff would receive the return of his capital contribution plus a share of any profits. The realization of any profit, however, much less a high rate of return, was never promised. Instead, contrary to the basic character of a Ponzi scheme, the Plaintiff's return on his investment would simply be contingent on what the market would support.

The Defendants also did not promise, much less deliver, an expeditious turnover of his investments, with the Plaintiff, to his consternation, pointing out that he made multiple capital contributions, and rolled over many of his contracts, before realizing any return on his investments. Such a course of conduct, however, goes completely contrary to the third characteristic of a Ponzi scheme, *supra* – which holds that the promoter of the Ponzi scheme will generally pay back the early investments on a timely and expedited basis so as to generate enthusiasm for additional contributions. The Plaintiffs' own evidence also goes far in contradicting the fourth of the above characteristics listed for a Ponzi scheme.

Typically, a Ponzi business will have little or no legitimate business purpose. However, in this case, the Defendants' business, R&E Exports, performed a legitimate function: that of buying and selling chattels. There is no reason to surmise that this business was a facade or a sham, with the Plaintiff acknowledging that the Defendants conducted extensive business activity. For example, the Plaintiff acknowledges that he saw his property and other property at the Defendants' place of

Page 19

business, thus showing that the Defendants were engaged in commerce. The Defendants' business also realized considerable sales over a number of years, an outcome not likely to occur in a business having no legitimate purpose. The ultimate demise of the Defendants' business, thus, cannot be said to have been inevitable.

Finally, it is normal in a Ponzi scheme for the promoter to live a lavish lifestyle. Evidence of this type of conduct, however, is lacking with regards to the Defendants. To begin with, the Plaintiff could not point to any large or unusual withdraws from the general business account of R&E Exports. The Defendants also did not take large bonuses from R&E Exports, instead consistently paying themselves $80,000.00 per year, a decent, but not out of the ordinary salary given the initial profitability of their business.

In addition, there is no indication that the Defendants spent funds from R&E Exports on other frivolities. The Plaintiff had argued to the contrary, making light of the fact that funds from R&E Exports had been used for things such as paying for trips by employees to amusement parks. As well, it was pointed out that funds from R&E Exports had been used to pay for entertainment expenses associated with business contacts – *e.g.*, paying for meals and other entertainment activities for clients.

However, in looking at the records, such expenditures were not so large and out of the ordinary that they cannot be ascribed to normal business operations. In this regard, the Court is not willing to ascribe any inference of fraud to a debtor's use of business funds for things such as entertainment for its employees and business contacts so long as the expenditures are reasonable and justifiable under the circumstances. As the saying in business goes: One must spend money to make money.

Page 20

## CONCLUSION

For those reasons set forth, the Court is not persuaded that the Plaintiff has established a case for fraud with respect to either the (1) transactions concerning the Defendants' business, R&E Exports, or (2) the transactions between the Parties concerning their real estate purchases. Nor is the Court persuaded that the Defendants, in taking investments from the Plaintiff, engaged in a Ponzi scheme. Instead, the evidence tends to support the conclusion that the Plaintiff simply invested in an otherwise legitimate business that ultimately failed.

This is not to say, however, that the Court finds the Defendants' actions to be above reproach. For example, the Court did find it disconcerting that the Defendants did sell some of the Plaintiffs' items without immediately repaying him. However, the real issue before the Court is not whether the Defendants did, in fact, commit fraud, but whether the evidence shows that it is more likely than not that the Defendants committed fraud. For the reasons set forth in this decision, the Court is not persuaded that this evidentiary burden has been sustained.

It should also be noted that, even if the Plaintiff had established that the Defendants acted with the intent to defraud, it is questionable whether the Plaintiff justifiably relied on the Defendants' misrepresentations as is necessary to sustain a claim under § 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995). When investing with the Defendants, the Plaintiff, despite utilizing a major portion of his life's savings, conducted neither a background nor a credit check of the Defendants. In fact, the only act which could be construed as an inquiry occurred when the Plaintiff cursorily met with the Defendants' banker. However, it had to be known to the Plaintiff that, as this meeting was done in the presence of the Defendants, and in an informal manner, it is unlikely that the banker, even if it had been warranted, would have disparaged the Defendants.

Page 21

In the interest of justice, however, no judgment will be entered in this case until the Defendants have been afforded the opportunity to perform their intentions, as stated at the Trial, concerning the two parcels of real property purchased by the Plaintiff. Concerning this property, the Defendants explained that their respective bankruptcies made it impossible for them to effectuate their intention of transferring their interests in this real property to the Plaintiff. At this time, however, bankruptcy is now no longer an obstacle, with the Defendants' interest in the real property having been abandoned from the estate. Accordingly, so as to effectuate the honest intentions of the Defendants, the Court shall, in accordance with 11 U.S.C. § 105(a), delay the entry of a finding of dischargeability in the Defendants' favor until such a time as they provide proof to the Court that they have effectuated a transfer to the Plaintiff of their interests in the two properties at issue.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of both parties, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that the Defendant, Jesus J. Marroquin, timely quitclaim his interests and that of his business, in the properties owned jointly with the Plaintiff, Barnard L. Bartson. Upon proof of such transfers being filed in this proceeding, an order of discharge will be entered consistent with this Decision.

Dated: November 5, 2010

/S/ RICHARD L. SPEER
_____
Richard L. Speer
United States
Bankruptcy Judge

# *CERTIFICATE OF SERVICE*

Copies were mailed this 5th day of November, 2010 to:

Bernard L. Bartson
760 Michaels Road
Fremont, OH 43420

James W Millon
Eastman & Smith, Ltd.
PO Box 10032
Toledo, OH 43699-0032

Janet E Hales
3137 W. Central Ave., PMB 8780
Toledo, OH 43606

Matthew D Harper
Eastman & Smith Ltd.
PO Box 10032
1 Seagate
24th Fl
Toledo, OH 43699-0032

Tiffany E. Courtney
Eastman & Smith Ltd.
One SeaGate, 24th Floor
PO Box 10032
Toledo, OH 43604

Joseph W Westmeyer, III
Westmeyer Law Office
421 N Michigan St
#C
Toledo, OH 43604-1606

Joseph W. Westmeyer, Jr
421 N Michigan St
#C
Toledo, OH 43604-1606

Jesus J. Marroquin
6665 Shadowcreek
Maumee, OH 43537

    /s/Dawn Serna-Gensch
Deputy Clerk, U.S. Bankruptcy Court